Good morning, Your Honors. May it please the Court, I'm Jeff Smythe, or Smith, whatever you prefer. If you prefer Smythe, that's what we'll use. Thank you, sir. I am here on behalf of Kam-Ko Bio-Pharm today. Kam-Ko was ordered by the District Court to pay a cover charge of $220,000 for admission to the ICC arbitration process or lose its rights. It does not do that. You've got some very sophisticated parties here. Your client, according to the record, proposed this arbitration clause in the first draft of the agreement. After you got to this point, you went to this International Arbitration Association. You signed a form with full knowledge of what the fees would be. You picked the number of arbitrators. In a commercial context, can you cite any case that would give you relief under the circumstances? Well, we cited and discussed at length the case of Teleserve Systems, Your Honor, which is a case out of New York that applied federal law. And in that case, which we believe to be, although it's a brief decision, it was fairly well reasoned, they simply stopped dead at the end of the process. And we have a $40 million dispute between MCI and Teleserve Corporation holding that on its face, that price for admission acted as a bar or impediment to access to justice, which flies in the face of all of the policies of arbitration. I couldn't tell from reading that appellate division opinion, did the complaining party draft the arbitration provision as your client did and propose it to the other side? The facts of that case are somewhat different in that respect. What happened was there was initially an arbitration clause in the contract between MCI and Teleserve. A dispute arose. That dispute was settled. A settlement agreement was then prepared and negotiated by the parties that included a different arbitration agreement. And that arbitration agreement imposed a formulaic determination of the advance cost that resulted in the $204,000 amount. The argument was, of course, made in that case. This was negotiated despite all the arguments that were raised about economic duress, et cetera. The Court didn't focus on that. Instead, it focused on the actual application in the particular facts and circumstances of the case. And that's what we're talking about here. And our position, I think, has been mischaracterized by Maine in its response. We do not challenge the arbitrability of this decision. We do not challenge the clause itself. We challenge the clause in its application to the particular facts and circumstances of this case. And that's how it's measured. And that's how it has to be measured in the substantive. I wonder if I can just direct it. On the Teleserve case, I'm frankly amazed that you would come to the United States Court of Appeals for the Ninth Circuit and cite a case from the appellate division of the trial court in the state of New York as your definitive argument. That case is very distinguishable. And you've got a situation here that's entirely different, where you drafted this thing. But let's even put that aside. Let's just say that the other side proposed it. You went to the International Arbitration Organization. You looked at the fee schedule. You knew in advance before you signed up what it would be based upon what you were asking for. You have an organization here that from the beginning was a conduit. It never had any assets. But the owners presumably do, because you've had the money that has come through in the meantime. I really fail to see what relevance and certainly no binding effect this New York trial case has on this case. Well, let me address that, if I might. First of all, I think that the Teleserve case was important because of the reasoning and the decision, the fact that it applied federal law, and the fact that it was between two commercial grown-ups, like this particular case is. I would cite to the court and did the Washington v. United States decision, in which case this court held that when determining the fairness or unfairness of an arbitration clause, the particular facts and circumstances of the case have to be borne in mind. Now, we believe, and our position in this case is, is that Judge Zille on the trial court level did not consider all of the relative and material facts and circumstances governing this particular case, namely, how this particular arbitration clause was implemented in this particular instance. Now, to respond to the second part of your comments, yes, when the arbitration was commenced, we had to move to compel Maine to participate. It ultimately, it ultimately did agree to do so. But our motion was consistent with the clause, and the clause says that the case will be arbitrated under the guidelines of the ICC. Unlike the AAA standard clauses that say you will arbitrate this with the American Arbitration Association and apply the construction arbitration rules, it was different. Now why wouldn't, why wouldn't the answer to that complaint be to present this argument to the arbitrator? The problem is we've got the Supreme Court decisions that, that tell us, under the Federal Arbitration Act, that, that it's basically our duty to enforce arbitration where the parties have agreed to it. That's correct, Your Honor. What you're really asking us to do under the guise, I guess, of the equitable remedies that are available in federal court is to reform the arbitration contract because you've now discovered that it's going to be more costly than what you had anticipated when you proposed it. You have anticipated what I was about to say, which is when we entered into this with the ICC, which, by the way, is no simple matter there in Paris, started coming back and forth, we initiated a process under the ICC rules to ameliorate the impact of this particular fee. We asked that the fee be broken down, that, that it be reconsidered based upon the simplicity of this case. This is a case that talks about the interpretation of a royalty contract. We're not talking about years of depositions, et cetera. Even Maine itself, in a document that was submitted, stated that it believed that this particular arbitration fee was excessive and burdensome. Their words, not ours. Their response was, if you pay us the $220,000, then we'll decide whether the $220,000 is oppressive or unfair. We believed that that was inappropriate. We went back. We completely exhausted the application process to the ICC. Well, it's really no different than if you want to litigate a tax claim in the district courts. You've got to pay the whole thing and then go and fight it afterwards, don't you? Except for one thing, and that is, this is the IRS we're talking about on the one hand. What I'm here talking about is access to justice and whether or not this type of a clause can be used as a weapon to prevent somebody from going to court. But you chose the justice. Well, again, that's correct. And we have no objection to the concept of arbitration here. What we do object to and what we believe Maine also, when it was convenient for it to do so, agreed with, is that there is a better way, even utilizing the ICC guidelines, to arbitrate this case than to erect this type of a bar. Even Justice Ireland pointed out in her affidavit before the court that this seemed to be unfair. That this was entirely out of proportion to what should have been charged. We would have been happy to have ---- She's one of the members of the arbitral panel. Correct. And so she's giving us a declaration that she would benefit from if we enforced the arbitration clause and you actually went to arbitration and paid the $220,000 fee. That's correct. And, actually, she was paid in full for the time she did spend on the case. I'm sure she was very well paid. Mr. Smyth had very well paid. At any point, does the record indicate whether CAMCO ever retained any significant sums of money from the commencement of this royalty agreement or was it all immediately paid out to its owners? I don't know the answer to that. I think that it's correct that the company was set up solely for the purpose of processing and collecting the royalties from the contract. Whatever the fees might have been, let's just say arguendo that the fees were $2,000. Where would that money have come from, according to the record? According to the record, the money would have been ---- the company would have been capitalized by its owners to pay that sum. And the same thing would be true if it were a higher fee, right? Well, within the realm of reason, yes. I understand. But, I mean, the reality is it's really the quantum rather than the concept. CAMCO never kept any money. It was like a partnership where everything flowed through the owner. Yes, sir, that's correct. So once a decision was made to go to arbitration, its members knew that they would have to capitalize CAMCO sufficiently to pay the arbitration, right? Yes, sir, that's correct. And they have received, according to the record, millions of dollars over a number of years of the royalty agreement. Is that correct? So main contends. Well, isn't that what the record shows? Well, that's what they state, yes. Okay. Is there anything in the record saying to the contrary? No, sir, there is not. Okay. So you've got members of this entity that have received millions of dollars over a number of years, decide they're going to go to arbitration. They obviously had, or they still have, the money to fund this if they wish to. They could capitalize CAMCO with enough money to pay this, right? Well, one would assert that Teleserve could have paid the $204,000 as well. You're not getting away with me with the State of New York Supreme Court, i.e., trial court level case. They could have made it a choice, right? Well, and that was what Judge Zille's ruling was. He said, why not just pay the $220,000 and worry about it later? We all make determinations. I suppose that there are arguments that could be made that somebody could have tapped a rich aunt or reefed into his or her own bank account or gone to the bank or done whatever. I don't think that that argument is a fair or a reasonable argument under these circumstances. But what we're wrestling here with, Mr. Smythe, is, as Judge Tallman has indicated, the Supreme Court has been very clear that arbitration, indeed Congress has been very clear, that arbitration is a very favored form of dispute resolution. Here we have two grown-ups, people dealing with a lot of money, choose their own forum, and then one of the parties that got millions of dollars out, according to the record, chooses not to put in a sum of money, $220,000, which is a relatively small portion of what the record shows they took out in order to arbitrate. Had they done so, you wouldn't even be here. You'd be arbitrating, and you'd have whatever result you were going to get. To some degree, frankly, to this judge, this almost seems like a contrived situation. I mean, I'm not even sure. To some degree, we do have a case in controversy, but it seems rather contrived to me because the mechanism that you established is there. You could go forward, and by doing it the way you've done, you have a case coming up before us. You're asking us to make a decision that two sophisticated companies can't decide the form in which they decide to act, or if one decides that it would prefer to change the form, it just says, I'm not going to put any money in. Does that make any sense to you? Well, Your Honor, I will reserve two minutes here, but let me just respond quickly to your point because I think it goes directly to the heart of it. Congress and the cases in the Supreme Court of the United States have made it very clear that arbitration is a favored forum, but the reasons for that are ease of access to justice, elimination of delay, minimization of expensive litigation, privacy, finality, and conservation of judicial resources. Absolutely none of these goals can be achieved if a financial barrier this high, and it was definitely judged by my clients to be too high. But that's a business determination. They're making a cost-benefit analysis. We don't want to risk $220,000, even though we're suing for $2.7 million or whatever the number is. What we want is to go to federal court and get them to rewrite the deal so that we don't have to pay $220,000 to get this thing arbitrated. Well, that's not the position we took. That's how it's coming across to this judge. The position that we took was that the initial advance payment was unreasonable. Whether or not factually the advance payment was like $2,500. Well, it's $2,500 plus $45,000, and then the remainder came to a total of $220,000, and that was the amount. Legal fees are going to be higher than that if you go through the arbitration. Extremely doubtful, and we have in the record that we believe that this case was a fairly simple, straightforward case of interpretation of a contract. That's one of the arguments that we made both to the arbitration panel and to Judge Zille, that this case wouldn't have consumed anywhere near that amount in administrative fees. Based on where you are now and where you want to go, I would be very surprised if the legal fees in this matter are less than $200,000 to your client by the time you're done, unless you are a very reasonably priced client. I'm sure they would agree with you in that hope, Your Honor. And indeed, Mr. Smythe, the reality is, at least if I understand it, the $225,000 isn't gone. It's just a deposit in advance to be sure that the arbitrators will be paid. Isn't that correct? Well, not from what I've heard about the ICC. Well, you're saying that's the experience is that they use up the fee. But isn't it very much the same? I know in Washington State, like we have in California, you have a lot of retired judges that become private arbitrators. And virtually to a person, if they have a sizable case, they want a very large deposit toward what they think the fees will be so they're certain they're going to get paid. I assume that's this practice here in Washington, is it not? Well, it is. But the question presented here by this appeal is what is very large and what is excessively and unnecessarily large. And I submit to you that while $10 probably would have been way too small, $10 million would have been way too big. And where is that line drawn? And that's a factual question. We'll call this the Smythe rule of quantum physics. I'll take that. Okay. Thank you very much, Mr. Smythe. Your time has expired, so we will now hear from your opposing counsel, Mr. Middleton. May it please the Court, Alan Middleton for the appellees in the case. Given the dialogue, I'm not quite sure that there's much of anything left for me to say. I think that one of the critical issues, one of the critical facts that distinguishes this case from virtually every case relied upon by CAMCO is the fact that CAMCO itself drafted, proposed this provision to the parties. It was accepted without change by Maine. And then CAMCO found that when it was confronted with the ICC's initial deposit demand, that the clause was no longer as convenient as it was when it was initially brought forward. Mr. Middleton, am I correct that your client could front the $200,000 if it wished to do so, and the arbitration would proceed in British Columbia? My client is a large pharmaceutical company. I understand. It's not a question of ability to pay. I'm just trying to understand how this ICC arbitral forum works. My understanding is either Mr. Smythe's client can pay the $220,000 or the respondent can pay the $220,000. But as far as the arbitrator is concerned, as long as somebody pays, they'll be happy to arbitrate whatever you ask. I think that's correct. I think it would be highly unusual when Maine was not seeking relief back against CAMCO. The more typical context would be where you have someone who finds themselves as a respondent in an arbitration, trying to advance its own claims, and the initial claimant fails to pay the arbitration fee, and so the respondent pays the fee in order that the proceeding can go forward. We have seen, and I think they're cited in the papers, consumer cases where an unconscionability of the fee argument was made and the respondent simply resolved the issue by tendering the arbitral fee and took the unconscionability argument out of the case. That's correct. I'd say that I've never seen that in anything beyond the consumer context, and I think it's fairly more frequent in the consumer context for a couple of very good reasons. If arbitration is avoided, then the non-consumer party will typically face such things as class actions that may be limited within arbitration. There are many incentives for parties to agree to pay. We did not get that far in this case. Instead, in fact, when the arbitration was dismissed or withdrawn, Maine had three motions still pending before the panel that had not been determined. Can you explain? I looked at the docket, and the parties signed a stipulated dismissal of the Federal District Court action after Judge Zille had ordered the parties to arbitrate. And can you explain why that stipulation was entered? The order from Judge Zille regarding arbitration was that CAMCO was given a certain period of time, as I recall, 60 days, to refile and proceed. CAMCO did not, and therefore we understood the impact of that, that CAMCO's claims were dismissed with prejudice, and therefore we submitted the stipulated order rather than having CAMCO report to Judge Zille and say, you know, we have chosen not to go before the ICC, and therefore the dismissal should now take effect. It was just the way we talked about and accomplished the act that would finish the case. Mr. Middleton, other than the Telser case, the New York Supreme Court case that was cited by Mr. Smyth, are you aware of any case in a non-consumer, if you will, unconscionability with a disadvantaged or smaller parties where a court has treated an arbitration clause as voidable because of its unfairness, i.e. in a commercial context like this? I personally am not. I have read a lot of cases for this case, for this appeal, and before the trial court there are many cases, obviously, I didn't read, but I'm not aware of one. And I think that the Telser case is irrelevant to our case here for a variety of reasons that have already been discussed, but I do believe that there were a number of factors going on in Telser which made that clause appear to be unduly unfair. It was procedurally questionable because there was at least an allegation of duress. It would force Telser to arbitrate in a remote forum. Here we were arbitrating in Vancouver, British Columbia, which, although not Seattle, is certainly not that inconvenient. In fact, it was neutral territory for an Australian entity and a U.S. entity. And that was actually picked, was it not, by counsel? That's correct. That's correct. I mean, it was part of the original arbitration clause that was proposed by CAMCO and agreed to by Maine. So at this point I see no case that is remotely similar to this one in which a court has declared an arbitration clause to be invalid or unconscionable because of the amount of the arbitration fee demanded by the entity. We've cited a number of cases in the brief where the ICC arbitration clause has been upheld. Frankly, $220,000, although it may seem to be excessive to some, I've been before the AAA and really one of the critical factors here is that the original arbitration clause said it was to go before three arbitrators. And so you're virtually tripling the arbitration fee that you would expect to pay based on that decision alone. And had the parties not done that, the fee would have been approximately a third. CAMCO also itself was requesting at least a quantifiable aspect of its claim, something over $2.5 million. And because the ICC calculates its fee based on the amount of the claim, you know, CAMCO was instrumental in making the fee as high as it was. That's typical of AAA, for example, and others, is it not? That's correct. I mean, they all have some variation. JAMS takes a more hour-by-hour view and doesn't charge its arbitrators' time in accordance with the amount of the claim, but they do charge an administrative fee, which is calculated based on the amount of claim. And in this case, does the record indicate that the $225,000, that may not have all been used up, is that correct? And part of it might have been returned if the proceeding was quick and easy, as Mr. Smyth suggests. My understanding is that it's a deposit, but I'm not going to represent to you that I know it's black and white. Well, the record did suggest that there was a $4,000 and change refund of the $45,000 that CAMCO had previously paid. That's correct. I just don't know whether the $220,000 falls into a different ---- That would be typical, would it not, in an arbitration context? In my experience, yes. Although I cannot claim experience with this issue before the ICC. And Mr. Smyth rightly stated that the ICC is somewhat unusual. You're dealing with people off in Paris, and it can take forever to get a response and that sort of thing. But with that, I really don't have anything more to say, unless you've got questions you'd like me to respond to. And I'll ask no further questions. Thank you very much, Mr. Miller. Thank you, Your Honor. The case just argued is submitted. And we will next hear argument in No. 07-35867.
judges: Beezer, Tallman, Smith